*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————————

**UNITED STATES**
Appellee

**v.**

**Pedro M. BESS Jr., Hospitalman Second Class**
United States Navy, Appellant

**No. 15-0372**
Crim. App. No. 201300311

Argued November 17, 2015—Decided January 6, 2016

Military Judges: Colleen Glaser-Allen, Douglas P. Barber Jr.

For Appellant: *Major John J. Stephens*, USMC (argued).

For Appellee: *Captain Matthew M. Harris*, USMC (argued); *Colonel Mark K. Jamison*, USMC, and *Major Suzanne M. Dempsey*, USMC (on brief); *Lieutenant Commander Keith Lofland*, JAGC, USN, and *Brian K. Keller, Esq.*

Judge STUCKY delivered the opinion of the Court, in which Chief Judge ERDMANN, Judges RYAN and OHLSON, and Senior Judge SENTELLE joined.

———————————

Judge STUCKY delivered the opinion of the Court.[1]

This case requires us to address the proper application of Rule for Courts-Martial (R.C.M.) 921(b), which allows the military judge, "in the exercise of discretion," to grant a request from the court members that "the court-martial be reopened and … additional evidence introduced." Here, the military judge received a request from the members for, inter alia, certain muster reports, after their deliberations had begun. Although the muster reports were properly admissible as business records, we hold that the military judge abused his discretion by presenting them to the court members without giving Appellant an opportunity to challenge

---

[1] Senior Judge David B. Sentelle, of the United States Court of Appeals for the District of Columbia Circuit, sat by designation, pursuant to Article 142(f), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 942(f) (2012).

their reliability before the factfinder. We cannot conclude that the error was harmless beyond a reasonable doubt, and thus reverse.

## I. Background

Before a general court-martial consisting of officer and enlisted members, Appellant, a radiological technician at a Navy clinic, was convicted, contrary to his pleas, of two specifications of attempting to commit indecent acts and four specifications of committing indecent acts, in violation of Articles 80 and 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 920 (2012). In each case, the indecent act that Appellant attempted or accomplished was convincing female X-ray examinees to fully undress without justification and viewing them in the nude. Appellant was acquitted of one specification of committing indecent acts, three specifications of assault consummated by a battery, and one specification of attempted vaginal penetration.

During the panel's deliberations, the court members submitted a question to the military judge asking whether they could view various documents that had been mentioned during cross-examination of Appellant and in closing arguments, including the "muster reports." During a session conducted outside the presence of the members, the Government called a witness, Ms. Wilson, to lay a foundation for the admission of the muster reports as business records. Ms. Wilson explained the manner in which the muster reports were created and stored, and testified that on each report she had written the date to which it pertained.[2] Appellant's counsel cross-examined Ms. Wilson and also called Hospitalman First Class (HM1) Cedric Odom, who had submitted two of the five muster reports, as a witness. After this testimony and arguments from both parties, the military judge decided that the muster reports were admissible under the exception to the hearsay rule for records of regularly conducted activity, better known as the "business rec-

---

[2] The muster reports were electronically saved by day, month, and year, with the date being recorded as the title of the report. But when printed, the reports did not show the title, and were thus essentially meaningless as printed until the custodian wrote the corresponding date on each muster report.

ords" exception. See Military Rule of Evidence (M.R.E.) 803(6).

Although Appellant asked to question the witnesses before the panel, the military judge denied the request and handed the reports to the panel with no explanation, stating only that they had "been admitted into evidence." Shortly thereafter, the panel found Appellant guilty of six of the eleven charged specifications.

Appellant was sentenced to a dishonorable discharge and confinement for two years. The convening authority approved the sentence and the United States Navy–Marine Corps Court of Criminal Appeals affirmed. *United States v. Bess*, No. NMCCA 201300311, 2014 CCA LEXIS 803, at \*24, 2014 WL 5449625, at \*8 (N-M. Ct. Crim. App. Oct. 28, 2014).

## II. Discussion

We granted review to consider Appellant's contention that the military judge abused his discretion by admitting the muster reports—in a case that turned in part on the identity of the alleged perpetrator—without allowing him to attack their weight before the factfinder.

During deliberations, "[m]embers may request that the court-martial be reopened and that portions of the record be read to them or additional evidence introduced. The military judge may, in the exercise of discretion, grant such request." R.C.M. 921(b); *see also United States v. Lampani*, 14 M.J. 22, 25 (C.M.A. 1982) ("our precedents make clear that, even after the court members have begun their deliberations, they may seek additional evidence").

We review a military judge's decision to admit or exclude evidence for abuse of discretion. *United States v. Carter*, 74 M.J. 204, 206 (C.A.A.F. 2015). This standard requires more than just our disagreement with the military judge's decision. *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015).

> Instead, an abuse of discretion occurs when [the military judge's] findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices

reasonably arising from the applicable facts and
the law.

*Id.* (alteration in original) (citation omitted) (internal quotation marks omitted).

## A. The Business Records Exception

The military judge did not err in concluding that the muster reports were admissible as business records. Ms. Wilson, who compiled and stored the muster reports by date on a daily basis, testified that she collected daily reports from supervisors, which were due at 8:00 a.m. Supervisors would submit real-time information about the physical status of those under their supervision, and Ms. Wilson would save the data as a daily muster report. Her testimony demonstrates that the muster reports qualified as business records since they were

> made at or near the time … from information transmitted by, a person with knowledge … kept in the course of a regularly conducted business activity, and … it was the regular practice of that business activity to make the … report … all as shown by the testimony of the custodian.

M.R.E. 803(6).

But even if these requirements are satisfied, a document may still fail to qualify as a business record if "the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.* The opponent of admission bears the burden of establishing sufficient indicia of untrustworthiness. *Shelton v. Consumer Products Safety Comm'n*, 277 F.3d 998, 1010 (8th Cir. 2002). Minor errors in a business record do not show that the business record is untrustworthy, but significant mistakes or internal contradictions may indicate a lack of trustworthiness. *See United States v. McGill*, 953 F.2d 10, 14–15 (1st Cir. 1992). However, "courts should not focus on questions regarding the accuracy" of a record in making the trustworthiness determination because the factfinder is responsible for weighing and assessing credibility of the admitted evidence. *Moss v. Ole South Real Estate, Inc.,* 933 F.2d 1300, 1307 (5th Cir. 1991). Appellant contends that the muster reports were so untrustworthy that their admission as business records constitutes an abuse of discretion. This argument fails.

Appellant cross-examined Ms. Wilson with limited effect, pointing out that one of the reports did not list the person submitting it and that Ms. Wilson did not directly verify the reports' veracity. When Appellant called HM1 Odom, he testified that he relied upon line-level supervisors to report on who was physically present. Odom also confirmed that those listed as "present" could have left five minutes after reporting for muster, and that people who were late to work, scheduled for a later shift, or detailed elsewhere on the base were listed as "late stay/special detail."

Given the limited results of the cross-examination and defense witness testimony, the military judge reasonably concluded that nothing had been presented that demonstrated a "lack of trustworthiness." M.R.E. 803(6). Service members represented as "present" had been physically verified by a line-level supervisor, and the rule requires only that the records be created based upon "information transmitted by … a person with knowledge." *Id.* Although the meaning of "late stay/special detail" could vary depending on the context, contemporaneous documentation need not be a model of statistical clarity to qualify as a business record. *See United States v. Foerster*, 65 M.J. 120, 125 (C.A.A.F. 2007) (noting that, in analyzing the analogous federal rule, federal courts have held that the business records exception should be "'construed generously in favor of admissibility'" (quoting *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 391 (Fed. Cir. 1996))). We conclude that the military judge did not abuse his discretion by admitting the muster reports as business records.

## B. Appellant's Right to Present a Defense

The question of admissibility is distinct, however, from the question of whether Appellant should have been allowed to attack the reliability of the evidence before the factfinder. *See United States v. Yeauger*, 27 M.J. 199, 202 (C.M.A. 1988) ("Once proffered evidence meets the foundational requirements for any of these exceptions [to the hearsay rule], it is admissible …. It is then for the factfinder to decide how much, if any, weight to accord it."), *overruled on other grounds as recognized in United States v. Moreno*, 36 M.J. 107, 121 (C.M.A. 1992).

"It is undeniable that a defendant has a constitutional right to present a defense." *United States v. Dimberio*, 56 M.J. 20, 24 (C.A.A.F. 2001). "Whether rooted directly in the Due Process Clause … or in the Compulsory Process or Confrontation clauses of the Sixth Amendment … the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted) (internal quotation marks omitted).[3]

The right to present a defense has many aspects. Under the Compulsory Process Clause, a defendant has a "right to call witnesses whose testimony is material and favorable to his defense." *Rock v. Arkansas*, 483 U.S. 44, 52 (1987) (citation omitted) (internal quotation marks omitted); *see also* Article 46, UCMJ, 10 U.S.C. § 846 (2012); R.C.M. 703; *United States v. Blazier*, 69 M.J. 218, 225 n.6 (C.A.A.F. 2010). "A defendant's Sixth Amendment right to confront the witnesses against him is violated where it is found that a trial judge has limited cross-examination in a manner that precludes an entire line of relevant inquiry." *United States v. Israel*, 60 M.J. 485, 488 (C.A.A.F. 2005). In addition, "[t]he Constitutional right of a defendant to be heard through counsel necessarily includes his right to have his counsel make a proper argument on the evidence and the applicable law in his favor." *Herring v. New York*, 422 U.S. 853, 860 (1975) (citation omitted) (internal quotation marks omitted).

"[T]he right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (alteration in original) (citation omitted) (internal quotation marks omitted); *see also Herring*, 422 U.S. at 862 ("The presiding judge must be and is given great latitude in

---

[3] *Crane* refers to the Due Process Clause of the Fourteenth Amendment. Of course, it is the Due Process Clause of the Fifth Amendment that applies to the military justice system. *Weiss v. United States*, 510 U.S. 163, 165 (1994); *Middendorf v. Henry*, 425 U.S. 25, 43 (1976). We see no reason why the right to present a complete defense would be narrower under the combined protections of the Sixth and Fifth Amendments than it is under the Sixth and Fourteenth Amendments.

controlling the duration and limiting the scope of closing summations."); *United States v. Lampani*, 14 M.J. 22, 26 (C.M.A. 1982) (a military judge has "considerable discretion" in determining whether the admission of additional evidence requires "reargument [or] reinstructions"). "This balance is bounded on the one hand by the broad discretion of trial judges and rulemakers' broad latitude under the Constitution to establish rules excluding evidence from criminal trials … and on the other by the Constitution's guarantee of a meaningful opportunity to present a complete defense." *Gaddis*, 70 M.J. at 252 (citations omitted) (internal quotation marks omitted).

While the military judge has broad latitude to control cross-examination, giving controverted evidence to the factfinder with no opportunity for the accused to examine or cross-examine witnesses or in any way to rebut that evidence in front of the members is unprecedented in our legal system, and cannot be reconciled with due process. In the full context of this trial, we conclude that Appellant's constitutional rights were violated. Giving the muster reports to the panel without affording Appellant an opportunity to (a) cross-examine Ms. Wilson, (b) call HM1 Odom as a rebuttal witness, or (c) have his counsel comment on the new evidence in front of the members deprived Appellant of his constitutionally protected ability to present a complete defense, and constituted an abuse of discretion.

The relevant witnesses were available, Appellant's evidence and cross-examination were relevant to the evidentiary weight the court members should afford the muster reports, and it would have been relatively easy to allow the parties to comment on the Government's altered case. Failure to give Appellant these opportunities violated his constitutional rights.

## C. Prejudice

"For constitutional errors, the Government must persuade us that the error was harmless beyond a reasonable doubt." *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002); *see also Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) ("A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not con-

tribute to the verdict obtained") (citation omitted) (internal quotation marks omitted). This is a question of law, which we review de novo. *United States v. Tearman,* 72 M.J. 54, 62 (C.A.A.F. 2013).

The muster reports here were properly admitted, but Appellant was precluded from challenging the evidentiary weight of those records before the factfinder. Accordingly, the question before us is whether we can conclude beyond a reasonable doubt that the members would have reached the same six guilty verdicts had Appellant been allowed to question the implications of the muster reports. While the question is a close one, we cannot conclude that the error that occurred was harmless beyond a reasonable doubt.

This was an extensive case with eleven specifications. The Government charged Appellant with indecent conduct or attempted indecent conduct with respect to seven victims, and with assault consummated by battery (touching while nude) with respect to three of those same victims. With regard to one victim—J.E.—Appellant was charged with a third count of attempted vaginal penetration. The panel, after receiving the muster reports, quickly returned a verdict acquitting Appellant of all assault specifications but convicting him of six of the seven indecent conduct specifications.[4]

The core of the Government's case was the testimony of the seven alleged victims, each of whom testified about a common modus operandi by the alleged perpetrator. When no other technicians were present, the X-ray technician would request that the victims completely disrobe. He would explain that the X-rays were medically required, and in the cases of A.L., D.B. and J.E., he used a sham nudity consent form. He would then X-ray the victims in various positions while they were nude, instructing them between X-rays on different physical positions they were to take.

One of the main issues that emerged at trial was whether the victims had confused Appellant, an HM2 African-American male with no discernible accent, with HM3

---

[4] The panel acquitted Appellant of all charges with respect to only one victim: O.L.S.

Philogene, a thinner African-American male who spoke with a Haitian accent.

Appellant concedes that with respect to victims A.A. and J.E. the identity of the alleged perpetrator was not at issue. Of the remaining four victims whose allegations resulted in a conviction, three of the victims identified Appellant as their X-ray technician in court,[5] two remembered his rank and his request for them to sign a nudity consent form,[6] and all four had X-rays taken that bore Appellant's identifying symbol.[7] Two recalled that the perpetrator had no discernible accent.[8]

But this evidence is not enough to demonstrate harmlessness beyond a reasonable doubt, because challenging the evidentiary weight of the muster reports could have shaken the Government's case.

The muster reports were not airtight evidence of Appellant's identity as the perpetrator. Had he been afforded his right to put on a complete defense, as we know from the testimony that the military judge heard, Appellant would have at least been able to demonstrate that Ms. Wilson did not physically verify the accuracy of the reports herself and that the reports were stored in an electronic location where they could have been subsequently altered. The testimony of HM1 Odom would have demonstrated that even those who submitted the reports relied upon others to provide accurate reporting data and that each muster report was only a snapshot of information thus submitted at 8:00 a.m., with no guarantee that an individual "present" at 8:00 a.m. might not immediately leave. Odom's excluded testimony could have also informed the panel that "late stay/special detail" can have various meanings, including absence from the clinic. If allowed to make a renewed closing summation, Appellant's counsel would have been able to argue to the factfinder that the muster reports should not carry much weight.

---

[5] Victims A.L., D.B., and P.G.

[6] A.L. and D.B.

[7] A.L., D.B., P.G., and B.S.

[8] D.B. and B.S.

Since Appellant was precluded from pursuing these inquiries before the panel, we cannot discern with certainty how effective efforts of this sort might have been. When we add to that the timing of events at the court-martial, we are unable to conclude that the error was harmless beyond a reasonable doubt.

In closing argument, the defense counsel had emphasized the Government's failure to introduce the muster reports as a significant weakness in its case. The members began deliberations at 7:55 a.m., and requested the muster reports and a number of other documents approximately an hour later. They were told at 9:35 a.m. that the parties were "working on" the muster reports, but that the other documents they requested were "not admissible under the rules." Three hours and forty-one minutes later, at 1:16 p.m., the muster reports were handed to the panel without comment, and over objection. They announced their findings at 1:49 p.m., only a half hour after receiving them and nearly six hours after deliberations began.

Clearly, the members were affected by defense counsel's argument, since they then requested the muster reports to see what was in them. While the Government argues that its evidence was overwhelming, this is not the case. The members asked for a substantial amount of additional evidence after an hour's deliberation (although they only received the muster reports), and eventually acquitted Appellant of five of the eleven specifications. Given the interest which the reports clearly provoked among the members, and the timing of the verdict, we simply cannot say that that the error did not contribute to the verdict beyond a reasonable doubt.[9]

## D. Conclusion

Admitting evidence without allowing the parties to dispute the reliability of that evidence before the factfinder cannot be reconciled with Fifth Amendment due process, or the protections of the Sixth Amendment. On these facts, we

---

[9] As the Supreme Court directs, we look not at some hypothetical reasonable panel, but at "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis in original); *see Chapman v. California*, 386 U.S. 18, 24 (1967).

cannot conclude that the denial of Appellant's right to present a complete defense was harmless beyond a reasonable doubt. While R.C.M. 921(b) permits a military judge to grant the members' request to introduce new evidence after they have begun deliberations, this case demonstrates that the military judge should review and weigh such requests with great caution. Procedures should be employed to ensure that no unfair prejudice is afforded to either party. *See* M.R.E. 403.

### III. Judgment

The judgment of the United States Navy–Marine Corps Court of Criminal Appeals is reversed. The findings and sentence are set aside and the record of trial is returned to the Judge Advocate General of the Navy. A rehearing is authorized.