# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

_____

## No. 201700073

_____

## UNITED STATES OF AMERICA
Appellee

v.

## MARTINZIE G. WATKINS
Gunnery Sergeant (E-7), U.S. Marine Corps
Appellant

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Major M. D. Zimmerman, USMC.
Convening Authority: Commanding Officer, 9th Marine Corps District, Great Lakes, IL.
Staff Judge Advocate's Recommendation: Lieutenant Colonel Jeffrey V. Munoz, USMC.
For Appellant: Lieutenant Commander Jacob E. Meusch, JAGC, USN.
For Appellee: Major Kelli O'Neil, USMC; Lieutenant George R. Lewis, JAGC, USN

_____

Decided 28 June 2018

_____

Before MARKS, JONES, and WOODARD, _Appellate Military Judges_

_____

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

_____

JONES, Judge:

A special court-martial composed of members convicted the appellant, contrary to his pleas, of violating a lawful general order and making a false official statement, in violation of Articles 92 and 107, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892 and 907. The members sentenced

the appellant to reduction to pay grade E-3 and a bad-conduct discharge. The convening authority approved the sentence as adjudged and, except for the punitive discharge, ordered the sentence executed.

The appellant raises five assignments of error (AOEs): (1) his conviction for violating a lawful general order is legally and factually insufficient; (2) the military judge erred by giving a mistake of fact instruction; (3) the military judge abused his discretion by denying the appellant's motion for expert assistance and an expert witness in the area of digital forensics; (4) the military judge abused his discretion in denying the appellant's motion to subpoena records; and (5) the military judge should have recused himself because he was not impartial.

After carefully considering the record of trial and submissions of the parties, we are convinced that the findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights has occurred. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

In the fall of 2014, RS met with Captain (Capt) SM, an Officer Selection Officer, to pursue commissioning in the Marine Corps. She completed an application package, met the physical qualifications, and attended pre-Officer Candidate School. In April 2015, she sustained serious injuries from a motorcycle accident, invalidating her earlier physical qualification. Capt SM put her application on hold in the Marine Corps Recruiting System in the summer of 2015. He also listed her as physically disqualified in his internal filing system and moved her file to his "drop drawer" for cases he would return to if the person sought to renew their application.[1] Later that year, Capt SM visited RS at a physical rehabilitation center. After RS confirmed that she still wanted to join the Marine Corps, Capt SM explained to her that she would have to "obtain new medical clearance documents . . . [and] submit them to me so I could submit them to the Bureau of Medicine to see whether or not they were going to requalify her."[2] The appellant became Capt SM's assistant near the end of 2015. The appellant met RS for the first time in January of 2016, when he accompanied Capt SM to a meeting with RS at a restaurant. Capt SM confirmed that RS could continue the process of seeking a commission in the Marine Corps after she was medically cleared by her civilian doctors. RS told them that she still wanted to become a Marine officer, and she was actively pursuing her medical clearance from her doctors.

---

[1] Record at 328.

[2] *Id.* at 199.

In February 2016, RS began attending poolee physical training functions at the recruiting office. It was at this time that she alleges the appellant began asking her personal questions, such as whether it "hurt to have sex" after her accident. She testified that they began exchanging sexually explicit pictures, and on 24 April 2016, they engaged in sexual intercourse at his apartment. According to RS, she saw the appellant socially three more times after that first encounter. Their next encounter was about a week after their sexual liaison, when the appellant appeared unannounced at her apartment in the middle of the night. The appellant found RS alone with a man in her apartment and accused her of cheating on him. Then, in mid-May 2016, they saw each other in the morning and then later went out to dinner. Late that night they had a loud disagreement in her apartment, and a neighbor called the police. When the police responded, they found the appellant in RS's apartment in a state of undress. After the police left, the appellant stayed the night with RS. RS claims the last time they saw each other was near the end of May 2016, when they went to the zoo and out to dinner, and the appellant again spent the night at her apartment. The following day, however, RS became upset with the appellant so she phoned Capt SM and told him about their relationship. To prove her claims, she texted Capt SM various photos implicating the appellant, including one of her and the appellant together in a hot tub.

Capt SM informed his chain of command of RS's allegations, and the command initiated a preliminary inquiry. The command appointed Capt CC to conduct the preliminary inquiry into the appellant's alleged misconduct. As part of his investigation, Capt CC interviewed the appellant. After waiving his rights, the appellant told Capt CC, "[f]or the record I [sic] only been to her house once, which was to give her purse as stated above and she [sic] never been to my house" or words to that effect.[3] Later, Capt CC confronted the appellant with a photo of the appellant in a hot tub with RS, and the appellant modified his story, admitting that he had been in the hot tub with RS.

Additional facts necessary to resolution of the AOEs are included below.

---

[3] Charge Sheet. At trial, Capt CC testified that the appellant's words were "for the record, I have never been to her house besides to return her belongings, and she has never been to my house or apartment." Record at 228.

## II. DISCUSSION

### A. Legal and factual sufficiency of the order violation

The appellant argues that the evidence is both legally and factually insufficient to find that he violated a lawful general order. We disagree.

We review questions of legal and factual sufficiency *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is whether, "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

To satisfy its burden, the prosecution was required to prove: (1) there was in existence a certain lawful general order in the following terms: Paragraph 4(a) of Depot Order 1100.4B, dated 1 September 2004, which prohibited wrongfully engaging in, encouraging, or soliciting, or otherwise seeking a nonprofessional personal relationship with a prospective officer candidate; (2) the appellant had a duty to obey the order; and (3) between on or about 1 March 2016 and 31 May 2016, on divers occasions, the appellant violated the order by wrongfully engaging in, encouraging, soliciting, or otherwise seeking a nonprofessional, personal relationship with RS, then a *prospective officer candidate*.[4]

---

[4] Record at 429-30 (emphasis added); Charge Sheet; Appellate Exhibit (AE) XXXVIII at 1; *see also* 10 U.S.C. § 892.

The appellant's principal contention is that RS was not a prospective officer candidate. The relevant Depot Order defined prospective officer candidates as "[t]hose persons who are being *actively processed* for an officer accession program by recruiting personnel in the course of their official duties."[5] The appellant argues that "[g]iven that no recruiting personnel were actively processing RS, she remained a 'potential applicant' as opposed to a prospective officer candidate."[6] The government asserts that RS was actively being processed for the officer accession program at all times during the charged period.

Capt SM testified that although he had put RS's file in a temporary drop drawer for further action, his office was still actively processing RS. It was his opinion that she qualified as a prospective officer candidate under the regulation. Although RS's injuries had negated her previous medical clearance, her injuries did not permanently disqualify her for admission because—as Capt SM testified—only the Bureau of Medicine can make that determination. During the entire charged period, RS was actively pursuing clearance letters from her civilian doctors so she could be accepted into the officer program, and the appellant's office was actively processing her for accession. In fact, by May 2016, when the appellant was engaged in a relationship with RS, she had already had hardware removed from some of her previous surgeries and had been medically cleared by a few of her civilian doctors.  When asked by a member if it was a common practice to actively process medically disqualified applicants, Capt SM responded that it was and then added that he had continued processing many people who had been "permanently" medically disqualified by the Military Entrance Processing Station and then been medically qualified by the Bureau of Medicine.[7] We find that RS was being actively processed for officer accession under the regulation at the time of her relationship with the appellant.

In addition to asserting that RS was no longer being actively processed as an applicant, the appellant also renews his contention from trial that the government failed to prove that he was the person found by the police in RS's apartment in the early morning hours of 2 May 2016. We reject this contention. Candidly, this is not a case of mistaken identity. We have no

---

[5] Prosecution Exhibit 2 at 2 (emphasis added).

[6] Appellant's Reply Brief of 5 Jan 2018 at 4.

[7] Record at 338. It was common practice for Capt SM's office to retain potential applicant files for four years in the hopes that someone who had initially expressed interest in the Marine Corps, but was initially medically disqualified, might become eligible.

doubt it was the appellant who gave the police his full name, full social security number, address, birthday, and provided proof of identification.

The government's case was formidable. They corroborated RS's claim that she and the appellant had been engaged in an intimate relationship. RS provided many details about the times when and locations where she and the appellant spent time together. She was able to describe the exterior and interior of the appellant's apartment. Moreover, even though she admitted to Capt CC that she "was out for revenge [and] pissed off" at the appellant, she provided uncontroverted photographic proof of the relationship, including a photo of her and the appellant in a hot tub together.[8]

Although the appellant provided various alibi witnesses, none of them testified to the appellant's whereabouts on the night he and RS first had sexual intercourse at his apartment. Furthermore, the alibi witnesses did not completely account for the appellant's whereabouts during other times when RS testified she was with the appellant. Although RS could be mistaken as to the exact time each event occurred, we have no doubt the appellant was in a hot tub with her and in her apartment the night the police were called. Proof beyond a reasonable doubt is a high standard but does not "mean that the evidence must be free from conflict." *Rankin*, 63 M.J. at 557 (citation omitted).

The appellant also demonstrated a consciousness of guilt. When the appellant learned that RS had contacted Capt SM regarding their relationship, the appellant confronted RS, telling her that "[she] was going to make him lose his job and that [she] should keep [her] mouth shut from there on out."[9] He then took her phone "so [she] wouldn't say anything further about [their] relationship to anyone else."[10] Finally, in an effort to avoid accountability for what he knew was illegal behavior, the appellant told the investigating officer that he had only been to RS's residence to drop off her purse. He then changed his story when confronted with the hot tub picture. The appellant's words and actions show his consciousness of guilt and belie any mistake of fact defense. *See United States v. Quichocho*, No. 201500297, 2016 CCA LEXIS 677, at 10, unpublished op. (N-M. Ct. Crim. App. 29 Nov 2016); *see also United States v. Gomez,* No. 201600331, 2018 CCA LEXIS 167, unpublished op., (N-M. Ct. Crim. App. 4 Apr 2018).

---

[8] *Id.* at 325.

[9] *Id.* at 264.

[10] *Id.* at 283.

Based on the record before us, and considering the evidence in the light most favorable to the government, a reasonable fact finder could have found all the essential elements of the charged offense beyond a reasonable doubt. *Turner*, 25 M.J. at 324. After weighing all the evidence and recognizing that we did not see or hear the witnesses, we are also convinced that the appellant is guilty beyond a reasonable doubt. *Rankin*, 63 M.J. at 557.

**B. Mistake of fact instruction**

The appellant avers that "[t]hrough his mistake of fact instruction, the military judge erroneously instructed the members that RS's status as a prospective officer candidate was a 'true fact' instead of a fact the [g]overnment was required to prove beyond a reasonable doubt" to secure a conviction for the orders violation.[11] We disagree.

Prior to trial and at trial, the appellant asked the military judge to give a mistake of fact instruction for the orders violation charge.[12] The military judge accommodated the request, instructing the members that

> The evidence has raised the issue of mistake of fact on the part of the accused concerning whether the accused mistakenly believed that [RS] was not a prospective officer candidate in relation to the offense alleged in Charge I. The accused is not guilty of the offense if: [o]ne, he mistakenly believed that [RS] was not a prospective officer candidate; and two, that such belief on his part was reasonable.

> To be reasonable, a belief must have been based on information, or lack of it, which would indicate to a reasonable person that [RS] was not a prospective officer candidate. In addition, the mistake cannot be based on a negligent failure to discover the true facts.[13]

"The question of whether the members were properly instructed is a question of law and thus review is *de novo*. . . . Where there is no objection to an instruction at trial, we review for plain error." *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014) (citations omitted). Here there was no objection by the appellant to the instruction as he specifically asked the military judge

---

[11] Appellant's Brief of 5 Sep 2017 at 36-37.

[12] AE XVIII at 10; Record at 412.

[13] Record at 431.

to give the generic mistake of fact instruction.[14] Therefore, the appellant bears the burden of demonstrating that: (1) there was error; (2) the error is clear or obvious; and (3) the error materially prejudiced a substantial right of the appellant. *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011). All three prongs must be satisfied; "the failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006).

For the first time on appeal, the appellant argues that the last part of the instruction—that "the mistake cannot be based on a negligent failure to discover the true facts"[15]—erroneously instructed the members that RS's status as a prospective officer candidate was a true fact. The appellant asserts that the military judge should have followed up the mistake of fact instruction by telling the members that the appellant would also be "not guilty of the offense if he *accurately believed* RS was not a prospective officer candidate."[16] If the appellant is correct, then it was the appellant's oversight at trial not to ask the military judge to clarify this concept. In other words, it is an unintended consequence of the appellant's request for a beneficial instruction, but it was not error.

The government in its closing argument as to the orders violation clearly endeavored to convince the members that RS was a "prospective officer candidate" despite her medical disqualification.[17] Defense counsel was even more focused in arguing his client's innocence to the members because RS was not a "prospective officer candidate" being actively processed.[18] The defense then argued mistake of fact as an alternate position, citing RS's two motorcycle accidents, the placement of her file in the drop drawer, "and that there could be no further action taken on her case, it's reasonable for [the appellant] to believe she was not a prospective officer candidate and that she

---

[14] We adopt the more generous standard of plain error analysis for the appellant. But the appellant may have waived this purported instructional error. He made a purposeful decision at trial to ask for the instruction, and then did not object to the instruction when it was given by the military judge. *See United States v. Gutierrez*, 64 M.J. 374, 376-77 (C.A.A.F. 2007) ("This court has recognized that there are no magic words to establish affirmative waiver. . . . In making waiver determinations, we look to the record to see if . . . there was a 'purposeful decision' at play.") (citations omitted).

[15] Record at 431.

[16] Appellant's Brief at 37 (emphasis in original).

[17] Record at 419.

[18] *Id.* at 422-23.

was not being actively processed for officer accession."[19] We do not find the military judge's instructions to be confusing, and we find no plain error. We have no doubt the members understood that they were to decide whether RS was in fact a prospective officer candidate.

Even if the instruction had been in error, we would refuse to grant relief under the invited error doctrine. "The invited error doctrine prevents a party from 'creat[ing] error and then tak[ing] advantage of a situation of his own making [on appeal].'" *United States v. Martin*, 75 M.J. 321, 325 (C.A.A.F. 2016) (quoting *United States v. Eggen*, 51 M.J. 159, 162 (C.A.A.F. 1999) (alterations in original)). "Invited error does not provide a basis for relief." *United States v. Raya*, 45 M.J. 251, 254 (C.A.A.F. 1996) (citation omitted). Here, the defense twice asked for the mistake of fact instruction and then used it in their closing argument.[20]

## C. Pretrial denial of defense expert assistance

The appellant contends that the military judge abused his discretion in denying the appellant's pretrial motion for expert assistance in the area of forensic mobile data. We disagree.

### 1. The facts

Two weeks before trial, the defense filed a late motion asking for expert assistance in the area of digital forensics. Despite failing to show good cause for the late filing, the military judge heard the motion. The appellant wanted expert assistance to aid him in presenting alibi evidence via his smartphone's Google Timeline. Google Timeline is a feature that, in conjunction with Google Maps, allows a person to track the date, time, and locations of a smartphone.[21] However, Google Timeline also allows the user to manipulate the timeline.[22]

At the motion session, the appellant called JM, a digital forensic examiner. JM explained that Google Timeline is a user-friendly application that allows one to pinpoint a phone's location using GPS, Wi-Fi signals emitted from the phone, and cell tower triangulation. He testified that data in Google Timeline could be altered or deleted, and that a person could

---

[19] *Id.* at 423.

[20] *Id.*

[21] *See generally*, GOOGLE MAPS HELP FORUM, https://support.google.com/maps/answer/6258979? co=GENIE.Platform%3DiOS&hl=en&oco=0 (last visited 11 Jun 2018).

[22] *Id.*

determine if information was deleted by looking at the usage of other applications on the phone. JM further testified that, if these applications were backed up on the cloud, they could also be used to accurately pinpoint a cell phone's location.

The defense argued that they needed the expert to "process and analyze the Google [T]imeline data" and "third party data" to show that the appellant was not at RS's apartment when the police officer said he was there.[23] The government argued that the defense was able to access their client's Google account and take screenshots of the Google Timeline without the assistance of an expert. They further averred that the defense's requested expert, JM, agreed that the programs were easy to understand. Last, they reminded the military judge that several alibi witnesses had been granted to the defense.

The military judge denied the motion, finding that the defense failed to carry their burden to establish that the expert assistance was necessary.

> Largely, this information is cumulative with other [alibi] witnesses. . . . The fact that more could be out there, and maybe you could find that he was also logged into his Facebook . . . is really unpersuasive in terms of whether or not you're required to have the government fund you somebody to go looking for that and digging for those things. . . . [Y]ou can't meet the standard for making the government fund that. . . .
>
> . . . .
>
> You can't show the expert would be of assistance. Specifically, when we're talking about this particular information, I find that it's easy to use and understand. . . .
>
> The fact that somebody from [the expert's company] might be about [sic] to explain how it's gathered or . . . pump up its reliability or maybe find more stuff out there isn't enough. . . . I think most people have a basic understanding of . . . turning on the location search services on their phone and that tracks where your phone is. . . .
>
> And further, I don't find that denial would result in a fundamentally unfair trial. I don't think that looking at the standard of whether or not denying it would be so outrageous that due process would be offended. . . . It's easy to understand information. It's easy for you all to look at and see how it plugs

---

[23] Record at 90.

into your case. I was able to simply look at it and I completely understood it right away. So I'm not ruling this information is inadmissible, however. I'm just saying that due process doesn't require the government to pay for the assistance.[24]

The military judge then encouraged the government to stipulate to the admissibility of the Google Timeline screenshots at trial or risk a substantial delay in the case because obtaining a MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 902(11), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.) self-authenticating affidavit from Google would "take a long time."[25] He warned the government that he would delay the trial for as long as the defense needed to get the affidavit from Google.

*2. No abuse of discretion*

We review a military judge's denial of expert assistance for abuse of discretion. *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010). The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be "'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997)).

The defense is entitled to an expert's assistance upon demonstration of necessity and a showing that "'denial of expert assistance would result in a fundamentally unfair trial.'" *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005) (quoting *United States v. Gunkle*, 55 M.J. 26, 31 (C.A.A.F. 2001)). The appellant must prevail by a "reasonable probability." *Id. See also* RULE FOR COURTS-MARTIAL (R.C.M.) 703, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.), and MIL. R. EVID. 702.

The "necessity" standard has a three-part test under which the appellant "must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop." *Bresnahan*, 62 M.J. at 143 (footnote omitted). To demonstrate necessity "an accused must demonstrate something more than a mere possibility of assistance from a requested expert[.]" *Gunkle*, 55 M.J. at 31 (citations and internal quotation marks omitted).

---

[24] *Id.* at 91-92.

[25] *Id.* at 93. The military judge did not force a stipulation of fact on the parties. Rather, he encouraged the stipulation of fact to get over the foundational concerns of hearsay and authenticity.

Here the military judge found that the defense failed to carry their burden to establish that the expert assistance was necessary. He found that the defense failed all three prongs: they did not show why the expert was needed, what the expert would accomplish for the accused, and how they were unable to gather and present the evidence that the expert assistance would help them develop. The military judge found that the Google Timeline evidence was easy to understand and well within the purview of the defense counsel to present at trial. Finally, the military judge concluded that the appellant would not be denied a fundamentally fair trial if the expert assistance was denied.

The record shows that the government and the military judge were focused on how easy it was to understand the Google Timeline. Neither appeared to understand that the defense wanted expert assistance to test the phone and see whether the appellant's Google Timeline had been manipulated. To their detriment, the defense failed to focus the parties on this issue during the motions session. In fact, the defense argued to the military judge that they needed the expert simply to assist them in understanding the Google Timeline data to pinpoint where their client's phone was at certain times; they did not refer to the need to test their evidence with the expert at all during their argument.[26] Despite this setback, the defense made the tactical decision to present the appellant's Google Timelines at trial, and whether the appellant manipulated the timelines became an issue.

The military judge did not enjoy the benefit of hindsight when he made his ruling. Our review of his findings and conclusions is limited to whether he abused his discretion based on the information he had at the time the motion was litigated—prior to trial. The abuse of discretion standard is a strict one and requires more than our disagreement with his ruling. Rather, we must find his ruling "'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous'" to find an abuse of discretion. *McElhaney*, 54 M.J. 130. Based on these particular facts, we conclude that the military judge did not abuse his discretion in denying the pretrial motion for expert assistance.

---

[26] JM testified during the motions session that he could determine if the Google Timeline had been altered by looking at the usage of other applications on the phone. The record is undeveloped regarding if someone inexperienced in digital forensics could do the same thing.

**D. Mid-trial denial of defense expert witness**

The appellant asserts that the military judge abused his discretion in denying the appellant's mid-trial motion for an expert witness in the area of forensic mobile data. We disagree.

*1. The facts*

A few days before the trial began, the government and the defense agreed to stipulate how Google Timeline records are created and stored, as well as how the appellant was able to access his Google Timeline via his email address and phone number. However, the government wanted the defense to also stipulate that Google Timelines can be manipulated or altered by the user. The defense refused. The parties met with the military judge in two R.C.M. 802 conferences in an attempt to resolve their differences. During these conferences, the government made clear that they intended to present evidence at trial that the Google Timeline was subject to manipulation by the user. The defense countered by warning that they might seek a continuance to secure an expert witness to rebut the contention that the appellant had modified his Google Timeline. The military judge indicated that he would be unlikely to grant a mid-trial continuance.

At trial, the government presented its case and rested with no mention of Google Timelines.

The defense then presented various alibi witnesses, attempting to show that the appellant was not where RS indicated he was at certain times. The defense also admitted the Google Timeline records from the appellant's phone, along with the stipulation of fact regarding the authenticity of the records. These timelines corroborated some of the defense's alibi testimony. However, they did not directly rebut RS's testimony of her relationship with the appellant or the police officer's testimony regarding seeing the appellant in RS's residence.

After the defense rested, the government announced its intention to call Capt CC, the preliminary inquiry officer, to explain how a Google Timeline could be manipulated. The defense objected:

> DC: In the first place . . . the testimony that they're trying to get would be expert testimony from someone who's not qualified to give that type of testimony. . . . [T]he more important point is that, we brought this issue up at a motions hearing [and] we requested an expert witness to address this exact issue.
>
> MJ: And it was denied.

DC: That's correct, sir. So, at this point, them being able to put on evidence that it could be manipulated when we would be able to get an expert witness, and forensic testing show[ing] that it objectively was not –

MJ: You don't know that you'd be able to show that or not.

DC: Sir, we–the expert witness that we spoke to testified that if he forensically tested the phone, that it could produce that –

MJ: Or it could not. . . .[27]

The defense then asked for a continuance to secure the expert witness, which the military judge denied. Finally, the defense asked that the government not be allowed to present the evidence through Capt CC. The military judge again denied this request, stating, "a trial is supposed to be about a search for the truth, and this was your evidence . . . produced by you, that you had complete dominion and control over."[28] The defense again argued that Capt CC was not an expert on the Google Timeline program and could not lay a proper foundation. The military judge overruled the defense, stating that Capt CC's lack of expertise was not a valid reason for prohibiting the government from calling him as a lay witness.

Capt CC testified that Google Timeline is accessed through a user's Gmail account, and a user could modify the Google Timeline. He further testified that he was able to alter his own Google Timeline such that it replicated the appellant's Google Timeline. When the government handed Capt CC one of the appellant's Google Timelines that had been admitted as a defense exhibit, Capt CC averred, "you can change anything on this document."[29] During cross-examination, however, the defense attacked Capt CC's limited experience with regard to the detectability of manipulation of the Google Timeline. Capt CC conceded that there was no way for him to know whether the appellant's Google Timelines were actually altered; he could only testify that it was possible for a user to modify them.

*2. Military judge's ruling*

We review a military judge's denial of an expert witness for an abuse of discretion. *United States v. Ruth*, 46 M.J. 1 (C.A.A.F. 1997). This requires

---

[27] *Id.* at 386-87. In actuality, the military judge had denied the pretrial motion for an expert consultant, not an expert witness.

[28] *Id.* at 387.

[29] *Id.* at 394.

more than our disagreement with the military judge's ruling; we must find the military judge abused his discretion.

"Each party is entitled to the production of any witness whose testimony on a matter in issue on the merits . . . would be relevant and necessary." R.C.M. 703(b)(1). This equal right to obtain witnesses specifically includes the "equal opportunity to obtain expert witnesses[.]" MIL. R. EVID. 706(a); *see also* Art. 46, UCMJ. The standard for production of an expert witness under R.C.M. 703(d) is more stringent than the standard for producing an expert consultant. To require production of an expert witness the appellant must establish the qualifications of the expert, the subject matter of the expert testimony, the basis of the expert testimony, the legal relevance of the evidence, the reliability of the evidence, and whether the probative value of the testimony outweighs other considerations. *Id.* (citing *United States v. Houser*, 36 M.J. 392, 399 (C.M.A. 1993)). Here the appellant asserts that the military judge abused his discretion in denying the expert witness request, yet, as the government points out, the appellant "makes no attempt to articulate how production was justified under the *Ruth* factors."[30]

The appellant did not show how his expert witness was relevant and necessary because JM had never actually reviewed the evidence. JM could not testify whether or not the appellant had manipulated the Google Timeline. The appellant failed to show that JM would have any basis to render such an expert opinion. Indeed, JM would have been relegated to speculating whether or not the appellant modified the timeline. Critically, the appellant never established the legal relevance of his proferred evidence and failed to meet the standards of both R.C.M. 703(b)(1) and *Ruth*.

The purported relevance of the expert's testimony was to show that the appellant did not manipulate his Google Timeline. The appellant had the burden to "demonstrate that the[ir] witness c[ould] offer an opinion based on facts or data related to the issue in question." *United States v. Reveles*, 41 M.J. 388, 394 (C.A.A.F. 1995) (citations omitted). In *Reveles*, the defense was denied a medical expert who could have testified that there was an alternative cause of death. *Id.* at 393. The Court of Appeals for the Armed Forces held that the defense request fell short of a showing of necessity. *Id.* at 394. "[T]he defense made no showing that [the expert's] testimony would be based on the actual facts of the case. The most that the defense could proffer was that [the expert] would testify that there was a theoretical possibility" something occurred. *Id.*

---

[30] Appellee's Brief of 5 Dec 2017 at 32.

Like *Reveles*, the defense here offered only a theoretical possibility that the expert could testify that the Google Timeline was not altered. The colloquy between the defense and the military judge reveals that JM could not say if the appellant manipulated his Google Timeline because JM had never examined the evidence. We find the military judge did not abuse his discretion in denying the mid-trial request for the expert witness.

### 3. Constitutional error and testing for prejudice

The appellant contends that "the military judge placed the parties on unequal evidentiary footing, which empowered the government to annihilate the reliability of [the appellant's] Google Timeline records while simultaneously depriving [the appellant] of the ability to credibly challenge the government's offensive."[31] He avers the playing field appears uneven and tilted in the government's favor. The defense argues that this raises constitutional due process concerns because the defense was denied their right to present a complete defense.[32] Assuming, without deciding, that constitutional due process concerns are implicated, we test for prejudice and conclude the error was harmless beyond a reasonable doubt.

"'For constitutional errors, the Government must persuade us that the error was harmless beyond a reasonable doubt.'" *United States v. Bess*, 75 M.J. 70, 75 (C.A.A.F. 2016) (quoting *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002)). "The inquiry for determining whether constitutional error is harmless beyond a reasonable doubt is whether, beyond a reasonable doubt, the error did not contribute to the [appellant's] conviction or sentence."

---

[31] Appellant's Reply Brief at 7.

[32] "It is undeniable that a defendant has a constitutional right to present a defense." *United States v. Dimberio*, 56 M.J. 20, 24 (C.A.A.F. 2001). "'Whether rooted directly in the Due Process Clause . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment . . . the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.'" *United States v. Bess*, 75 M.J. 70, 74 (C.A.A.F. 2016) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, (1986) (additional citations omitted). *See California v. Trombetta*, 467 U.S. 479, 485 (1984) (holding that an accused is entitled to "a meaningful opportunity to present a complete defense.") Furthermore, "[u]nder the Compulsory Process Clause, a defendant has a 'right to call witnesses whose testimony is material and favorable to his defense.'" *Bess,* 75 M.J. at 75 (quoting *Rock v. Arkansas*, 483 U.S. 44, 52, (1987) (additional citations omitted); *see also United States v. Woolheater*, 40 M.J. 170, 173 (C.M.A. 1994) ("the Constitutional right to present defense evidence is a 'fundamental' right . . .") (citing *Chambers v. Mississippi*, 410 U.S. 284 (1973)); *United States v. Blazier*, 69 M.J. 218, 225 n.6 (C.A.A.F. 2010) ("a defendant has the right to the compulsory process of witnesses who can provide relevant and necessary evidence in their defense.").

*United States v. Hills,* 75 M.J. 350, 357 (C.A.A.F. 2016) (citations and internal quotation marks omitted). "To say that an error did not 'contribute' to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overturned on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 1991)) (internal quotation marks omitted).

As a preliminary matter, the Google Timeline only reveals where the appellant's phone was at a particular time, not necessarily the location of the appellant. Therefore, the expert could only have testified regarding the location of the phone, not the appellant. Additionally, RS may have been mistaken as to the exact time an event occurred, and the appellant could still be found guilty of engaging in an unprofessional relationship with her. But most importantly, in spite of the appellant's contentions, neither the alibi witnesses nor the Google Timeline adequately refutes the two strongest pieces of evidence proving his guilt—the photo of him in a hot tub with RS and the police officer's positive identification of the appellant at RS's apartment in a state of undress in the early morning hours.

Given the overwhelming evidence the appellant was engaged in an inappropriate relationship with RS, we are convinced beyond a reasonable doubt that any assumed errors did not contribute to the appellant's conviction or sentence. "As the Supreme Court directs, we look not at some hypothetical reasonable panel, but at 'whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.'" *Bess*, 75 M.J. at 77 n.9 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis in original) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). Here, the Google Timelines showing the location of the appellant's phone were unimportant in relation to everything else the panel considered in this case.

**E. Subpoena of records**

The appellant contends that the military judge abused his discretion when he denied as cumulative a defense motion to compel records of (1) cell phone tower data from the appellant's cell phone account; and (2) Google Timeline GPS data from the appellant's Gmail account.[33] We disagree.

---

[33] The appellant addresses more grounds for relief in his motion by citing to AE XIII, a "Supplemental Discovery Request" dated 10 November 2016. However, during the motions session, only the cell phone tower data and the Google Timeline GPS data were litigated. Record at 93-96.

Each party to a court-martial is entitled to an "equal opportunity to obtain witnesses and other evidence[.]" Art. 46, UCMJ. R.C.M. 703(a) establishes that the opportunity to obtain witnesses and evidence includes the benefit of compulsory process. The government may obtain, by subpoena, evidence that is not under its control. R.C.M. 703(f)(4)(B). "Each party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(f)(1). MIL. R. EVID. 401 defines relevant evidence as that which has "any tendency to make a fact more or less probable than it would be without the evidence[.]" Relevant evidence is "necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue." R.C.M. 703(f)(1), Discussion. The moving party has the burden of persuasion on these motions for appropriate relief. R.C.M. 905(c)(2)(A), 906(b)(7). *See United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004).

"In the case at bar, resolving the issue requires application of R.C.M. 703 to a defense request for [a] subpoena . . . . The issue is in virtually every respect identical to a request for the production of a witness." *United States v. Rodriguez*, 57 M.J. 765, 770 (N-M. Ct. Crim. App. 2002). Therefore, we review a military judge's ruling on a request for production of evidence via subpoena for an abuse of discretion. *Id.*; *United States v. Breeding*, 44 M.J. 345, 349 (C.A.A.F. 1996) (denial of a request for additional witnesses). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

### 1. Cell phone tower data

Although the defense requested phone call logs in their discovery request,[34] their argument at the motions session focused on obtaining cell phone tower data. This was to buttress the Google Timeline evidence they wanted to present to show that the appellant was not where RS claimed he was at certain times. The defense, as the moving party, was required as a threshold matter to show that the cell phone tower data existed. They failed to do so. The military judge asked the defense how long the cell phone carrier maintained the cell phone tower data. The defense did not know. The military judge found that depending on the retention policy of the phone carrier, cell phone data is unavailable after 60 to 90 days without an order or

---

[34] AE XIII.

demand to preserve it. Applying R.C.M. 703, the military judge concluded that the defense had failed in their burden to show the existence of the data. *Rodriguez*, 60 M.J. at 246 (noting that the appellant assumed the existence of evidence and its evidentiary value with no showing that the evidence existed). We agree with the military judge—the appellant did not carry his burden as the moving party to demonstrate that the cell phone tower data actually existed.

Additionally, applying R.C.M. 703, the military judge found that if the cell phone tower data did exist, it was cumulative with the multiple alibi witnesses and the Google Timeline screenshots already in the possession of the defense.[35] If the data did exist, the appellant failed to show that the data was relevant and necessary, not cumulative, and should have been produced through compulsory process. We conclude that the military judge did not abuse his discretion in denying the appellant's motion to compel production.

*2. Google timeline*

The defense requested that the military judge order the government to subpoena the appellant's Google Timeline data and order Google to "produce that information with a [MIL. R. EVID.] 902(11) affidavit."[36] MIL. R. EVID. 902(11) allows for self-authentication of certified domestic records of a regularly conducted activity. In other words, the defense wanted to ensure that their Google Timeline evidence would not have been ruled inadmissible because they could not authenticate it at the time of trial.

As a preliminary matter, the appellant has a duty to try to obtain the information himself first. *Rodriguez*, 60 M.J. at 246. The military judge found that there was nothing to subpoena because the defense was already in possession of the records they sought, and requesting the same records would be cumulative. However, the military judge indicated he would encourage the government to stipulate to the authenticity of the evidence to prevent any

---

[35] Although we do not find the military judge abused his discretion, we do take issue with his comment during the ruling when he said "I think . . . when you said corroborative I think a synonym for that is cumulative. And I think it is cumulative with the Google data that we already have." Record at 95. "Cumulative" and "corroborative" are not synonyms; corroborative evidence is not cumulative. *See United States v. Lee*, 28 M.J. 52, 55 (C.M.A. 1989) (stating that the corroborative nature of evidence does not make it cumulative). Nevertheless, we hold that the military judge cited the correct standard under R.C.M. 703 and applied it, and he considered the requested evidence cumulative with both the Google data and the several alibi witnesses. We do not find that "incorrect legal principles were used" to reach the outcome. *Ellis*, 68 M.J. at 344.

[36] Record at 95.

foundational objections at trial. In fact, the two parties stipulated to the foundational requirements of the Google Timeline evidence.

We find that the appellant did not carry his burden as the moving party to demonstrate that a government subpoena of the Google Timeline records was not cumulative with what the appellant already had in his possession. The appellant presented no evidence that the subpoenaed records were any different than what the defense already had in their possession, or that the records would have shown that the appellant did not manipulate the Google Timelines. In sum, the appellant did not show that the records were relevant and necessary or that they should have been produced through compulsory process. We conclude that the military judge did not abuse his discretion in denying the appellant's motion to compel production.

## F. Military judge recusal

The appellant contends that the military judge should have recused himself because he was not impartial. The appellant alleges that the military judge "shaped the defense case from the outset of trial," and therefore "a reasonable person would conclude that the military judge abandoned his impartial role."[37] A closer look at this AOE, however, reveals that the appellant's allegation of a lack of impartiality by the military judge is based solely on the military judge's permitting Capt CC's lay testimony about manipulating the Google Timeline but denying the appellant an expert witness for surrebuttal.[38] We rejected these issues above. Here we conclude that the military judge never abandoned his impartial role and was not under a *sua sponte* duty to recuse himself.

"'An accused has a constitutional right to an impartial judge.'" *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (quoting *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999)). "There is a strong presumption

---

[37] Appellant's Brief at 54.

[38] The appellant sub-divides his claim of partiality into four sub-parts:

A. The military judge prohibited the Defense from presenting evidence that supported the reliability of the Google Timeline records. B. The military judge shaped the Defense case to focus on the Google Timeline records. C. After the Defense admitted the Google Timeline records and rested their case, the military judge allowed the Government to recall Capt [CC] in rebuttal to testify that the Google Timeline records were not reliable. D. In allowing Capt [CC] to testify in rebuttal, the military judge abandoned his neutral role, placing his impartiality and the court-martial's legality and fairness into doubt.

Appellant's Brief at 56-64.

that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle[.]" *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (citation omitted). Disqualification of a military judge may occur for either the appearance of bias or actual bias. *See* R.C.M. 902(a) and (b). "The appearance standard is designed to enhance public confidence in the integrity of the judicial system." *Quintanilla*, 56 M.J. at 45 (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 (1988)). "Th[is] rule also serves to reassure the parties as to the fairness of the proceedings[.]" *Id.* (citations omitted)

"'[W]hen a military judge's impartiality is challenged on appeal, the test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt' by the military judge's actions." *United States v. Martinez*, 70 M.J. 154, 157-58 (C.A.A.F. 2011) (quoting *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000)) (quotation marks omitted). "The appearance of impartiality is reviewed on appeal objectively and is tested under the standard set forth in *United States v. Kincheloe, i.e.,* '[a]ny conduct that would lead a reasonable man knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification.'"[39] *Id.* at 158 (quoting *Kincheloe,* 14 M.J. 40, 50 (C.M.A. 1982)) (quotation marks omitted) (additional citations omitted).

---

[39] We acknowledge the appellant's contention that the military judge made several intemperate comments during the trial including that he was not "going to have the government . . . pay to bolster [the defense's] evidence[,]" and his suggestion that the appellant could take the stand to rebut Captain CC's testimony. Record at 387-88. Although we find those comments inappropriate and unnecessary, each comment was made outside the presence of the members, and, in the context of discussions with counsel that reflected the military judge's understanding of the applicable law. A thorough examination of the record reveals no prejudice to the appellant. *United States v. Reynolds*, 24 M.J. 261, 264 (C.M.A. 1987). We caution military judges against superfluous comments that might diminish public confidence in the integrity and impartiality of the proceeding. A military judge must always ensure that the court-martial appears fair. "[T]he issue of the *appearance* of fairness in a criminal proceeding is generally understood as a reference to the appearance of fairness to the accused. After all, it is the accused's constitutional right to a fair trial that is most often at issue." *United States v. Dockery*, 76 M.J. 91, 100 (C.A.A.F. 2017) (Sparks, J., concurring) (citing *Press-Enterprise Co. V. Superior Court*, 464 U.S. 501, 508 (1984)) (emphasis in original).

Here there is no evidence that the military judge was biased; he was firm but fair to both sides. The full record discloses that the military judge applied the law correctly and even-handedly. We find that the "court-martial's legality, fairness, and impartiality" were not put into doubt. *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000) (citations and internal quotation marks omitted). We conclude that a reasonable person observing this court-martial would have full confidence in the judicial process.

### III. CONCLUSION

The findings and sentence are affirmed.

Senior Judge MARKS and Judge WOODARD concur.

For the Court



R.H. TROIDL
Clerk of Court